UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| JOANNE MACKAY NASTI, | § | |
| | § | |
| Plaintiff, | § | |
| v. | § | CIVIL ACTION NO. H-04-04590 |
| | § | |
| CIBA SPECIALTY CHEMICALS | § | |
| CORPORATION, | § | |
| | § | |
| Defendant. | § | |

MEMORANDUM AND ORDER

This case arises from Plaintiff JoAnne Nasti's claims against Defendant Ciba Specialty

Chemicals Corporation ("Ciba") for sex discrimination, defamation, and violation of the Family

and Medical Leave Act ("FMLA"). Ciba now moves for summary judgment, arguing that Nasti's

claims are unsupported by the evidence and without merit. For the reasons set forth below, Ciba's

Motion for Summary Judgment (Docket # 21) is **GRANTED**.

I.  BACKGROUND

Nasti began her employment with Ciba in 1997 and received high work-progress reviews

and ratings from Ciba management. In 2002, Nasti accepted the position of Global Account

Executive and became the manager of Ciba's Dow Global account, a position Ciba classified as

"Grade 11." At that time, Nasti was designated at "Grade 10." Ciba management informed Nasti

that her personal ranking would remain at Grade 10 until she demonstrated her ability to fulfill the

requirements of the position and manage a Grade 11 account. Nasti testified by affidavit that she

thereafter secured the Dow account and received accolades from Dow with respect to her

performance. Nasti Aff. ¶ 24. Nasti did not receive a promotion to Grade 11. *Id.*

In early 2003, Ciba named Bob Becherer as the sales manager of its new NAFTA Resin

Producers group ("NAFTA"). Nasti alleges that Becherer was a lesser-qualified male and not

within Ciba's leadership pool.  Nasti Aff. ¶ 27.  Additionally, Nasti indicates that Becherer lived in St. Louis and did not relocate to Houston for the NAFTA sales manager position.  *Id.*  Ciba asserts that it formed the new NAFTA group from the integration of two of its previous groups, Customer Specific Blends, which was headed by Becherer, and Base Polymers, which was headed by Tony O'Driscoll and employed Nasti.  Carol Snyder, Former Ciba Human Resources Manager, Aff. ¶ 9.  Following this integration, O'Driscoll moved to another position, and Becherer became the sales director for the new NAFTA group.  *Id.*  As sales director, Becherer was Nasti's administrative boss and supervisor for her domestic, NAFTA-based accounts.  *Id.* ¶ 12.

Later in 2003, Nasti communicated with Stephan Bocken, President of Ciba's Paper Division in Switzerland, who expressed an interest in discussing a possible position for Nasti in his division.  In October 2003, Nasti met with David Almond, a sales director who reported to Bocken, to discuss a potential sales manager position.  Nasti alleges that Almond concluded the meeting by informing her that he would contact Ciba's Human Resources department to secure the approvals necessary for her transfer.  Nasti Aff. ¶ 33.  Nasti indicates that she was later informed by Bocken and Almond that they had been told that she was on a performance improvement plan, and was "untouchable" in the company.  *Id.* ¶ 34.  Ciba had not advised Nasti of this, and Nasti had no knowledge that she was on a performance improvement plan.  *Id.*

Ciba concedes that Nasti met with Almond to discuss a possible position in Bocken's division; however, Ciba asserts that the position for which Nasti interviewed had not yet been approved for recruitment and ultimately never developed into an opening.  Snyder Aff. ¶¶ 18-19. Rather, Almond's segment decided to assign the duties that would have been performed by the new manager to existing account managers, and then used the slot to replace a different key role in the division that Nasti was not qualified to hold.  *Id.*

Also in 2003, Nasti agreed to assist with Bostik Findley, one of Ciba's smaller clients, after a Ciba competitor offered the Bostik Findley facility in Milwaukee a low price on a product. Bostik Findley was a subsidiary of Atofina, a large global customer of Ciba for which Nasti had account responsibility.  Because Ciba was concerned that negotiations with Bostik Findley might undermine pricing agreements put in place with Atofina, Nasti agreed to facilitate the pricing discussions.

In August 2003, Nasti visited Bostik Findley's Milwaukee facility with Chris Fagouri, the Ciba representative who was the primary contact for the Bostik Findley account.  Nasti combined this trip to Bostik Findley with a personal trip to see her daughter in South Bend, Indiana, which Nasti had already scheduled.  To accommodate the need for the meeting, Nasti adjusted her return flight so that she would be able to meet with Bostik Findley representatives on Monday, August 25, 2003.  Nasti used her personal frequent flyer miles for the trip, and Ciba incurred no expense for Nasti's airfare, despite the fact that Nasti was entitled to charge the tickets to Ciba under company policy.  Nasti Aff. ¶ 3.  At the August 25 meeting, Nasti and Fagouri met with Bostik Findley representatives Barb Brown, Gary Delzell, and Gary Wilkes, who agreed to consider a Ciba product that could match the pricing offered by Ciba's competitor.

Nasti then scheduled a follow-up visit in Milwaukee with Barb Brown for September 22, 2003.  Due to Chicago's close proximity to Milwaukee, Nasti booked a non-refundable ticket for the trip through Chicago.  A week later, Nasti learned that Gary Delzel had replaced Brown in her purchasing role at Bostik Findley.  On September 19, Nasti departed for Chicago and called Gary Delzel from the airport to confirm the Monday meeting.  Nasti discovered that Brown had not informed Delzel of the meeting; however, because she had booked a non-refundable ticket, she decided to make the trip and planned to meet with Bostik Findley's technical personnel who would be evaluating Ciba's product.  Nasti Aff. ¶ 9.  Upon arriving in Chicago, Nasti drove to

South Bend, Indiana to see her daughter and brother.  Nasti testified that it was "a routine practice and allowable at Ciba to combine business and personal matters while traveling, especially over a weekend."  *Id.*

On Saturday, September 20, Nasti learned that she would be able to schedule an urgent meeting for her major ExxonMobil account on September 25, 2003.  Nasti therefore decided to return to her office  in Houston  on Monday, September 22 without visiting the Bostik Findley facility, so that she could begin planning for the ExxonMobil meeting.  On September 22, Nasti flew to Houston and went directly to her office, where she participated in conference calls  with Becherer and others regarding the ExxonMobil account.  Nasti Aff. ¶¶ 10-11.  From September 22 through October 5, 2003, Nasti took part in several telephone calls with Bostik Findley and Atofina, which resulted in Bostik Findley's agreement to accept Ciba's new product at a lower price.  *Id.* ¶ 12.

Nasti submitted expense reports seeking reimbursement for two trips to Bostik Findley, one in August and one in September.  For the September trip, Nasti sought reimbursement for her rental car, dinner, tolls, and airport parking, for a total of $270.00.  In November 2003, Becherer asked Nasti to explain the expenses and to submit call reports documenting the client meetings, as Ciba's protocol required.  Becherer Aff. ¶ 18.  Nasti forwarded to Becherer a call report for the August trip, which she had previously submitted to him.  *Id.*  Nasti also submitted to Becherer a call report detailing the second, September trip.  *Id.*; Call Report, Def.'s Ex. 13.  This call report indicated that Nasti had "scheduled this meeting with Gary Wilkes to discuss and close."  Def.'s Ex. 13.  The call report then stated that "Gary began the meeting . . . He asked why we hadn't yet provided a sample and I showed him the shipping documentation.  He excused himself from the table and returned with the sample in his hand.  He had found it on Barb's desk."  *Id.*

Nasti testified in her affidavit that Becherer was familiar with her need to abandon the September Bostik Findley trip in order to return to Houston to plan for the ExxonMobil meeting, as Becherer had participated in the conference calls with her on September 22.  Nasti Aff. ¶ 13. Nasti assumed that Becherer needed her to satisfy internal auditing standards for the rental car expense and wrote the call report with this in mind.  *Id.*  Nasti alleges that she had no intention of deceiving anyone and wrote the call report to memorialize what took place during the telephone calls that had substituted for her intended visit to the Bostik Findley facility.  *Id.*  Nasti also maintains that the charges for which she had sought reimbursement were legitimate business expenses.  *Id.* ¶ 14.

Becherer testified by affidavit that he found Nasti's call report for the September Bostik Findley trip troubling.  Nasti had submitted the report only after he asked her to document expenses that she had already turned in for reimbursement.  Becherer Aff. ¶ 19.  Becherer had also instructed Nasti to make only one visit to the Bostik Findley facility in Milwaukee and thereafter to handle the account from Houston.  *Id.*  Finally, Becherer felt that the report lacked "meat" and "failed to show why another visit to Bostik Findley's Milwaukee facility was necessary."  *Id.* Becherer wondered whether the trip had actually occurred.  *Id.*

By this time in late 2003, Ciba's management had begun discussing whether or not Nasti had a future at Ciba.  Nasti's managers felt that while Nasti had strong business skills, she had also demonstrated sufficient deficiencies in key areas such as team-building, counseling employees, listening to peers, enlisting support, and providing feedback.  Baker Aff. ¶¶ 9, 13; Becherer Aff. ¶ 20; Snyder Aff. ¶¶ 15-17.  Around the Thanksgiving holiday, Nasti's various managers, with input from Ciba's Human Resources group, decided to terminate Nasti for these performance reasons. Baker Aff. ¶ 13; Becherer Aff. ¶ 20; Snyder Aff. ¶ 20.  The group chose not to discharge Nasti prior to the holidays, but rather to wait until January 2004.  Becherer Aff. ¶ 20.

Between the time when Ciba management decided to terminate Nasti in late November 2003 and efforts to arrange a meeting with Nasti in January 2004, Becherer followed up on the call report Nasti had previously submitted for the September trip to the Bostik Findley facility.   After Becherer contacted Bostik Findley and learned that the September meeting had not taken place, Becherer discussed Nasti's call report with his supervisor, Bill Baker, and Human Resources manager Gregory Policastro.   Becherer Aff. ¶¶ 23-24.   Becherer, Baker, and Policastro concluded that Nasti had submitted a false call report.   Becherer Aff. ¶ 24; Baker Aff. ¶¶ 15-16; Policastro Aff. ¶ 7.   Because they believed that Nasti's call report overshadowed the existing issues concerning her performance, they decided to terminate Nasti's employment for the allegedly false call report and the submission of expenses in connection with the call report.   Becherer Aff. ¶¶ 23-25; Baker Aff. ¶ 16; Policastro Aff. ¶ 7.

Because Nasti had taken a disability leave of absence in early January 2004, Policastro and Becherer informed Nasti of her termination in a telephone call, which took place on January 20, 2004 and in which her husband, Gary Nasti, participated.   Policastro testified that when first asked about the second Bostik Findley trip in September 2003, Nasti maintained that she had attended this second meeting at the customer's location.   Policastro Aff. ¶ 9.   After Becherer told Nasti that he had contacted Bostik Findley and learned that the second meeting did not take place, Nasti explained that she had cancelled the trip in light of the ExxonMobil meeting, and that her call report described the telephone calls that took place in lieu of the meeting.   *Id.*

Nasti subsequently filed this lawsuit, contending that Ciba discriminated against her on the basis of her gender and terminated her in violation of the FMLA.   In her Second Amended Complaint, Nasti added a claim against Ciba for defamation.   The Court held a hearing on Ciba's Motion for Summary Judgment and now concludes that the motion should be granted.

## II. ANALYSIS

### A. Summary Judgment Standard

A motion for summary judgment under Federal Rule of Civil Procedure 56 requires the Court to determine whether the moving party is entitled to judgment as a matter of law, based on the evidence thus far presented. *See* Fed. R. Civ. P. 56(c). "Summary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Kee v. City of Rowlett*, 247 F.3d 206, 210 (5th Cir. 2001) (quotations omitted). A genuine issue of material facts exists if a reasonable jury could enter a verdict for the non-moving party. *Crawford v. Formosa Plastics Corp.*, 234 F.3d 899, 902 (5th Cir. 2000). The Court views all evidence in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. *Id.*

"[A] complete failure of proof concerning an essential element of [Nasti's] case necessarily renders all other facts immaterial" and "mandates the entry of summary judgment" for Ciba. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). If Ciba shows that there is a lack of evidence to support Nasti's case, Nasti "must go beyond the pleadings and designate specific facts showing that there is a genuine issue for trial." *Kee*, 247 F.3d at 210 (quotation omitted). Nasti cannot satisfy this burden with conclusory allegations, unsubstantiated assertions, or only a scintilla of evidence. *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc) (per curiam).

### B. Discrimination Claims

#### 1. Discriminatory Termination

Title VII prohibits an employer from discriminating "against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's

race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). A plaintiff may prove Title VII discrimination through direct evidence or circumstantial evidence. *Laxton v. Gap Inc.*, 333 F.3d 572, 578 (5th Cir. 2003); *Russell v. McKinney Hosp. Venture*, 235 F.3d 219, 222 (5th Cir. 2000). Where there is no direct evidence of discrimination, as Nasti concedes is the case here, a plaintiff may prove a case of sex discrimination with circumstantial evidence, using the burden-shifting framework established by *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). *See Wallace v. Methodist Hosp. Sys.*, 271 F.3d 212, 219 (5th Cir. 2001).[1]

Under the *McDonnell Douglas* framework, a plaintiff must first establish a prima facie case of sex discrimination. *Wallace*, 271 F.3d at 219. The employer then bears the burden of producing a legitimate, non-discriminatory reason for its actions. *Id.* The employer is not required to convince the Court that it was actually motivated by this reason; it need only raise a genuine issue of fact as to whether or not it discriminated against the plaintiff. *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254 (1981). Once the employer offers a legitimate, non-discriminatory reason for the plaintiff's treatment, the presumptions of the *McDonnell Douglas* framework dissipate, and the plaintiff bears the ultimate burden of persuading the trier of fact that the defendant engaged in intentional discrimination. *Wallace*, 271 F.3d at 219; *Russell*, 235 F.3d at 222. To satisfy this burden, a plaintiff must produce substantial evidence that the employer's proffered reasons for its actions were a pretext for discrimination. *Wallace*, 271 F.3d at 220. A plaintiff can establish pretext "either through evidence of disparate treatment or by showing that the employer's proffered explanation is false or 'unworthy of credence.'" *Laxton*, 333 F.3d at 578 (citing *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000)).

---

[1] Nasti has also brought a claim of gender discrimination under the Texas Commission on Human Rights Act (TCHRA). TCHRA claims are analyzed under Title VII precedent, as the law governing Title VII and TCHRA discrimination claims is identical. *Wallace*, 271 F.3d at 220 n.10; *Shackelford v. Deloitte & Touche, LLP*, 190 F.3d 398, 404 n.2 (5th Cir. 1999). Accordingly, it is not necessary to analyze Nasti's TCHRA claims separately, and the Court will refer simply to Title VII in this Memorandum and Order.

Here, Ciba assumes in its summary judgment motion that Nasti established a prima facie case of discriminatory termination, thereby shifting the burden to Ciba to articulate a legitimate, non-discriminatory reason for terminating Nasti. Ciba has successfully met this burden by its explanation that it terminated Nasti because she submitted a false call report to justify personal expenses that she had turned in as business expenses. *See* Def.'s Motion for Summary Judgment at 12. Accordingly, Nasti must raise a genuine issue of material fact as to whether this explanation is merely pretext, such that a reasonable factfinder could infer discrimination.

a. *Inconsistency or Contradiction in Defendant's Proffered Reasons*

Nasti asserts that Ciba has offered two inconsistent explanations for her termination, which demonstrates that its proffered reason is pretext. A court may infer pretext where a defendant has provided inconsistent or conflicting explanations for its conduct. *See Read v. BT Alex Brown Inc.*, 72 Fed. Appx. 112, 120, 2003 WL 21754966, at *7 (5th Cir. 2003). According to Nasti, while Ciba maintains that it terminated Nasti because she had filed false expense reports, Becherer gave contradicting testimony that the decision to terminate Nasti was based upon her poor performance. Nasti argues that a reasonable jury could infer from this inconsistency that the explanations for her termination were pretext. The Court disagrees.

Nasti has mischaracterized Becherer's testimony and ignored Ciba's explanation of the two, independent decisions that Ciba management made to terminate her. Nasti states that "Ciba never mentions that a determination to terminate Nasti had been made prior to the alleged falsification of expenses, wholly ignoring the fact that Becherer expressly stated that the decision to terminate her was made prior to concluding that the expense reports were falsified." Pl.'s Response to Motion for Summary Judgment at 21. This is incorrect. Rather, on pages six through eight of its motion, Ciba explains at length that although a decision was initially made in November 2003 to terminate Nasti for performance issues, "Becherer, Baker and Policastro then

decided to terminate Nasti's employment for the false call report and the submission of expenses in connection with that call report, as this issue overrode and superseded all other problems with Nasti's performance."  Def.'s Motion for Summary Judgment at 8.

Ciba's supporting affidavits affirm this explanation.  Becherer testified that "the issues raised by the submission of that false report completely overshadowed the existing issues concerning Ms. Nasti's performance for which her employment was to be terminated."  Becherer Aff. ¶ 24.  Baker similarly testified that once he learned of the falsified call report, "the decision to terminate Ms. Nasti's employment for performance reasons was no longer relevant.  Ms. Nasti could not work for Ciba after falsifying a call report, even if she were an exemplary employee."  Baker Aff. ¶ 16.  Policastro likewise testified that "[e]ven though Ciba would have terminated, and initially intended to terminate, Ms. Nasti's employment for the performance reasons previously considered, . . . once the false call report came to light, there was no question whatsoever about it: Ciba could not continue to employ Ms. Nasti."  Policastro Aff. ¶ 7.

Ciba's explanation of how it initially decided to terminate Nasti for performance reasons, and then decided to terminate Nasti for the more important issue of falsifying reports, is consistent and reasonable.  Ciba's reasons for terminating Nasti – her performance issues and her falsification of the call report – are not contradictory.  Moreover, Nasti has not demonstrated any lack of candor or consistency on Ciba's part in explaining its decisions that Nasti should be terminated.  The Court therefore finds no inconsistencies or contradictions in Ciba's proffered reasons for Nasti's termination that demonstrate pretext for discrimination.

b.  *Error in Defendant's Proffered Reasons*

Nasti also asserts that her "affidavit testimony establishes that she did not falsify an expense report; she merely documented expenses for an aborted trip in a manner consistent with her perception of Becherer's instructions."  Pl.'s Response to Motion for Summary Judgment at

21.   Nasti testified that because Becherer had participated in conference calls with her on September 22 to plan for the ExxonMobil meeting, she believed that he was familiar with her need to abandon the September Bostik Findley trip.  Nasti Aff. ¶ 13.  Nasti also testified that she had no intention of deceiving anyone with the call report, and that the charges for which she sought reimbursement were legitimate business expenses.  *Id.* ¶¶ 13-14.

Nasti's reasoning seems to be that she did not falsify the call report, that Ciba management should have realized that she had not falsified the call report, and that, therefore, Ciba's decision to terminate her was flawed.  To the extent that this argument goes to the correctness of Ciba's decision to terminate her, it misses the mark.  Viewing the evidence in the light most favorable to Nasti and construing her testimony as true and accurate, the Court finds that Nasti may have identified an issue of fact as to whether she intended to falsify the call report.  The Fifth Circuit and other courts, however, have consistently held that such an inquiry into whether an employer's termination decision was correct is irrelevant to an employee's discrimination claim.  *Bryant v. Compass Group USA Inc.*, 413 F.3d 471, 478 (5th Cir. 2005) ("[E]vidence that the employer's investigation merely came to an incorrect conclusion does not establish a racial motivation behind an adverse employment decision.  Management does not have to make proper decisions, only non-discriminatory ones."); *Little v. Republic Ref. Co.*, 924 F.2d 93, 97 (5th Cir. 1991) ("The existence of competing evidence about the objective correctness of a fact underlying a defendant's proffered explanation does not it itself make reasonable an inference that the defendant was not truly motivated by its proffered justification."); *Jeffries v. Harris County Cmty. Action Assoc.*, 615 F.2d 1025, 1036 (5th Cir. 1980) ("[W]here an employer wrongly believes an employee has violated company policy, it does not discriminate in violation of Title VII if it acts on that belief.").

Nasti has failed to show that Ciba management was not truly motivated by the belief that she had falsified the call report.  Ciba's belief that Nasti had falsified the call report is reasonable

and supported by the evidence.  Although Nasti admits that her report memorializes events that took place during a series of telephone calls and not an in-person meeting at the Bostik Findley facility, the report indicates that Nasti had "scheduled *this meeting* with Gary Wilkes to discuss and close." Call Report, Def.'s Ex. 13 (emphasis added).  The report then states that "Gary began the meeting . . . He asked why we hadn't yet provided a sample and I showed him the shipping documentation.  He excused himself from the table and returned with the sample in his hand.  He had found it on Barb's desk." *Id.*  Nasti has conceded that a reasonable person would conclude that the events described in the report took place at an in-person meeting.  Nasti Dep. 283:4-16; 287:25-288:9, Apr. 22, 2005.  In emails to Becherer regarding her Bostik Findley trips, Nasti also failed to mention that she had cancelled the second meeting and instead conducted the business through a course of telephone calls.  Rather, Nasti's emails indicate that she "came in to meet the agent" on the second trip, Def.'s Ex. 12, and that in the future she would obtain Becherer's "buy-in on trips such as this," Def.'s Ex. 13.  It is not surprising that Ciba concluded from this that Nasti had falsified her report by writing it in a misleading manner.

Additionally, Nasti's testimony that Becherer participated with her in the September 22 conference calls does not show that Becherer was aware that she had cancelled a second Bostik Findley trip, or if he was aware of this fact, that he recalled it when Nasti submitted the call report in November.  On the contrary, Becherer testified in his affidavit that he found Nasti's call report troubling and questioned whether Nasti had actually made the trip to the Bostik Findley facility. Becherer Aff. ¶ 19.  Becherer, Baker, and Policastro have all testified to the veracity of their belief that Nasti had written her call report in a manner that was false or misleading, and that this action required her termination.   Becherer Aff. ¶¶ 23-25;  Baker Aff. ¶¶ 15-16; Policastro Aff. ¶ 7. Because Nasti has failed to present any evidence that Ciba was not truly motivated by its belief

that she had falsified the call report, her claim that Ciba's belief was in error does not establish pretext.

### c.  Supervisor's Remarks

In addition to the claims discussed above, Nasti suggests that several remarks made by Becherer indicate a discriminatory animus toward women.  In her deposition, Nasti recalled a female colleague telling her that Becherer had told the colleague that "he could not understand how a working mother could do it or why they would do that and why they did not stay at home." Nasti Dep. 123:19-22.  Nasti also recalled a message that Becherer left on her home phone that he was "sure you are in baking cookies with the kids," and another comment that Becherer made to her that "[t]here's a problem with Exxon.  Why don't you bring them a tray of cookies?"  Nasti Dep. 124:7-13.

Remarks may serve as sufficient evidence of discrimination if they are (1) related to the employee's protected class; (2) proximate in time to the employment decision at issue; (3) made by an individual with authority over the employment decision; and (4) related to the employment decision.  *Auguster v. Vermillion Parish Sch. Bd.*, 249 F.3d 400, 405 (5th Cir. 2001) (citing *Brown v. CSC Logic, Inc.*, 82 F.3d 651, 655 (5th Cir. 1996)).[2]  In order for a gender-based comment to demonstrate an employer's discriminatory intent, "it must be direct and unambiguous, allowing a reasonable jury to conclude without any inferences or presumptions that [gender] was a determinative factor in the decision to terminate the employee."  *See Wyvill v. United Cos. Life Ins. Co.*, 212 F.3d 296, 304 (5th Cir. 2000).   None of Becherer's remarks meets these requirements.

---

[2] Although the Fifth Circuit questioned its stray remark doctrine after the Supreme Court's ruling in *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133 (2000), it concluded that *Reeves* did not overrule the doctrine, "at least where the plaintiff has failed to produce substantial evidence of pretext."  *Auguster*, 249 F.3d at 405; *see also Wallace*, 271 F.3d at 222.  Because the Court finds that Nasti has failed to produce substantial evidence of pretext, it will analyze Becherer's comments under the Fifth Circuit's stray remark doctrine.

Although each of the three comments came from an individual with some authority over Nasti's termination, Nasti has offered absolutely no evidence that any of the comments was related to her termination in any way.  Additionally, none of these remarks directly or unambiguously demonstrates bias or discriminatory animus toward women.  While Becherer's comment about working mothers is gender-related, it does not indicate a bias against working mothers or a belief that women should not work.  At best, it indicates that Becherer has difficulty understanding the issues working mothers face, which falls far short of the evidence needed to permit a conclusion that gender was a determinative factor in the decision to terminate Nasti.  Additionally, Nasti does not know when or in what context Becherer made this remark, and a colleague's recollection to Nasti of a comment that Becherer had previously made to the colleague is hearsay and unreliable.

Becherer's second remark regarding Nasti's making cookies with her children and his third remark about bringing cookies to ExxonMobil are not even clearly gender-related.  Becherer has testified that he may have left Nasti a message about making cookies with her children, and that baking cookies "is a holiday tradition that [his] family enjoys very much."  Becherer Aff. ¶ 30.  Making holiday cookies is an activity that could be, but is not necessarily gender-related, and this remark is in no way indicative of discrimination against women.  Similarly, Becherer testified that in an email regarding a potential issue with ExxonMobil, he suggested to Nasti that the holidays were a "great time to bring in a platter of cookies and do some snooping."  *Id.*  This comment is also not obviously connected to gender; rather, it pertains to relations with one of Ciba's and Nasti's clients.

Nasti has failed to show how Becherer's remarks are either gender-related or connected to her termination, and his comments do not demonstrate pretext or a discriminatory bias.  Nasti has failed to present sufficient evidence to permit a reasonable factfinder to infer discrimination, and summary judgment for Ciba on Nasti's claim of discriminatory termination is appropriate.

14

2. *Other Discriminatory Treatment*

In her Second Amended Complaint, Nasti references other incidents that she suggests were discriminatory, including Ciba's failure to give her a grade level promotion, Ciba's failure to choose her for a new management position, and Ciba's failure to allow her to transfer to a position in another division. In her Response to Ciba's Motion for Summary Judgment, however, Nasti does not argue that these incidents themselves constitute violations of Title VII, focusing instead on her claim for discriminatory termination. The Court has considered the possibility that these incidents were discriminatory and now concludes that Nasti has failed to present sufficient evidence that any of these incidents violated Title VII or the TCHRA.

a. *Grade Level Promotion*

Nasti alleges that when she accepted the position of Global Account Executive (GAE), a position Ciba classified as Grade 11, management informed her that she would need to demonstrate her ability to fulfill the requirements of the position before she would be moved from a Grade 10 to a Grade 11 classification. Nasti alleges that she demonstrated her ability to fill the position by securing the Dow account and receiving accolades for her performance, yet she was not moved up to Grade 11. In her deposition, Nasti indicated that a male, Tom Vermeulen, moved into the same position as a Grade 11. Nasti Dep. 170:18-23.

A plaintiff states a prima facie case of promotional discrimination by showing that (1) she was a member of a protected class; (2) she was qualified for the promotion she sought; (3) she was denied the promotion; and (4) similarly situated employees outside the protected class were treated more favorably. *See Rubinstein v. Adm'rs of the Tulane Educ. Fund*, 218 F.3d 392, 399 (5th Cir. 2000). Here, Ciba concedes in its motion for summary judgment that Nasti has met the first three elements of a prima facie case. However, as Ciba correctly points out, Nasti has not presented evidence that similarly situated male employees were treated more favorably.

Although Nasti mentioned in her deposition that Vermeulen, a male, was moved into her position as a Grade 11, she does not indicate her basis for knowing Vermeulen's grade level or status with Ciba. In contrast, testimony from Ciba management indicates that Vermeulen assumed the position of GAE for the Dow account in February 2003, as a Grade 10. Becherer Aff. ¶ 26. Becherer, who would have supervised Vermeulen and had direct knowledge of Vermeulen's classification at Ciba, testified that Vermeulen was not promoted to Grade 11 until May 2005. *Id.* Becherer testified that Vermeulen worked as a GAE for two years and two months before he demonstrated the skills warranting the promotion to Grade 11. *Id.* Becherer additionally testified that Mark Speer, a male who assumed the position of GAE for ExxonMobil after Nasti's termination, was still ranked as a Grade 10 as of July 12, 2005, the date of his affidavit. *Id.* ¶ 27. Nasti held the position of a GAE for less than two years, and her supervisors have testified that she failed to demonstrate the skill set that was necessary for the promotion to Grade 11. Baker Aff. ¶ 8; Snyder Aff. ¶ 15; Becherer Aff. ¶¶ 9, 14.

Aside from her bare assertion that Vermeulen was classified as a Grade 11 when he became a GAE, an assertion that the evidence indicates was incorrect, Nasti has offered no evidence that Ciba treated similarly situated males differently or more favorably than Nasti. Accordingly, Nasti has failed to state a prima facie case of discrimination with respect to her grade level, and Ciba is entitled to summary judgment.

### b. NAFTA Group Sales Director Position

Nasti's Second Amended Complaint alleges that in *May* 2003, Ciba denied her a new management position and hired a lesser-qualified male who was not in Ciba's leadership pool. In her Response to Ciba's motion for summary judgment, Nasti claims that in *February* 2003, Ciba denied her a new management position in order to hire a lesser-qualified male, Bob Becherer, who was not in Ciba's leadership pool. *See also* Nasti Aff. ¶ 27 (referring to Becherer receiving the

position in February 2003).  Since these claims appear to pertain to one incident, and since Nasti

has made no further reference to being denied a position in May 2003, the Court presumes that

Nasti's allegation concerns Ciba's failure to promote her to the position that Becherer received in

February 2003.

As Ciba correctly points out, this claim is barred by limitations.  The limitations period for

Title VII cases is normally 180 days "after the alleged unlawful employment practice occurred."

42 U.S.C. § 2000e-5(e)(1).  In Texas and other states that provide state or local administrative

mechanisms to address complaints of employment discrimination, however, a Title VII plaintiff

who files a charge of discrimination with the state or local agency has a 300-day period in which

to file the charge after learning of the discriminatory conduct.  *See Huckabay v. Moore*, 142 F.3d

233, 238 (5th Cir. 1998).  Because Nasti filed her charge of discrimination with the EEOC on

March 3, 2004, the actions of which she complains must have taken place on or after May 8, 2003

in order to be actionable.  Accordingly, Nasti's claim of being denied a position that was filled in

February 2003 is barred by limitations.

Even if Nasti's claim were not time-barred, she has failed to state a prima facie case of

promotional discrimination.  Although Nasti makes the claim that Becherer was a lesser-qualified

male and not within Ciba's leadership pool, she fails to demonstrate how she had personal

knowledge of Becherer's qualifications, and she does not support her claim with any evidence of

Becherer's qualifications or leadership experience with Ciba.  Ciba, on the other hand, has

presented evidence that the new management position became available when Ciba integrated its

Customer Specific Blends and Base Polymers groups to form the NAFTA group.  Snyder Aff. ¶ 9.

At this time, Becherer was the sales director of the Customer Specific Blends group, and he

retained this sales director position with the NAFTA group after the integration.  *Id.*, Becherer Aff.

¶¶ 2, 4.  Because Nasti has failed to establish a prima facie case of discrimination with regard to the sales director position, summary judgment for Ciba is proper.

### c. Position with Bocken's Division

Nasti alleges that she was denied a position with Ciba's Paper Division in Switzerland, after Stephan Bocken expressed an interest in working with Nasti, and after David Almond interviewed her for the position and indicated that he would secure the approvals necessary for her transfer.  Under this type of failure to promote claim, a plaintiff must show that she (1) belongs to a protected class; (2) she applied for and was qualified for a job in an available position; (3) she was rejected for that position; and (4) after the rejection, the position remained open and the employer continued to seek applications from persons of her qualifications for the position.  *See McDonnell Douglas*, 411 U.S. at 802.

Though Nasti belongs to a protected class and has presented evidence that she was qualified for but did not receive a position in Ciba's Paper Division, she has offered no evidence that any position remained open in the Paper Division or that the Paper Division continued to seek applications after Nasti was denied the position.  On the contrary, Ciba has offered evidence that at the time of Nasti's meeting with Almond, no new position had been approved for recruitment, and the Paper Division was considering various possible roles to fill with its open position.  Snyder Aff. ¶ 18; Email from Cherie Hutton, Ciba Human Resources, to Bob Becherer (Dec. 11, 2003), Def.'s Ex. 25.  Moreover, soon after Nasti's meeting with Almond, the Paper Division decided not to fill the position that Nasti had discussed with Almond.  Snyder Aff. ¶ 18; Def.'s Ex. 25.

Because Nasti cannot show that Ciba continued to seek applications for a position she was denied, she has failed to state a prima facie case of discrimination with respect to this claim.  Moreover, Nasti has failed to produce any evidence that Ciba discriminated against her because of

her gender.  In the absence of such evidence, summary judgment in favor of Ciba on Nasti's Title VII and TCHRA claims is warranted.

## C. Defamation Claim

Nasti's Second Amended Complaint alleges that Ciba defamed her by publishing the following statement in its 2004 Annual Report:  "In 2004 there were two incidents that merited disciplinary action:  a conflict of interest in materials purchasing and a serious abuse of expense claims.  Those responsible are no longer employed by the company."  Second Am. Compl. ¶ 5.13. Nasti claims that a reasonable reading of this passage falsely associates her with the abuse of expense claims, and therefore, with a lack of truthfulness.  Nasti also suggested in her deposition that she believes Ciba made statements to persons both inside and outside of the Ciba organization that Nasti was unfavorably discharged.  Because Nasti failed to include these claims in her amended complaint and to include any evidence or even mention of these claims in her Response to Ciba's Motion for Summary Judgment, however, the Court finds at the outset that summary judgment on these claims is appropriate.

For a plaintiff who is not a public figure or official, such as Nasti, to establish a defamation claim under Texas law, the plaintiff must prove that the defendant:  (1) published a statement; (2) that was defamatory concerning the plaintiff; (3) while acting negligently with regard to the truth of the statement.  *WFAA-TV, Inc. v. McLemore*, 978 S.W.2d 568, 571 (Tex. 1998).  Whether a statement is reasonably capable of a defamatory meaning is a threshold question of law to be determined by the courts.  *Turner v. KTRK Television, Inc.*, 38 S.W.3d 103, 114 (Tex. 2000); *Musser v. Smith Protective Servs., Inc.*, 723 S.W.2d 653, 654-55 (Tex. 1987).  A court should construe an allegedly libelous statement "as a whole in light of the surrounding circumstances based upon how a person of ordinary intelligence would perceive it."  *Turner*, 38 S.W.3d at 114.

19

Statements should not be made defamatory by taking them out of context. *Raymer v. Doubleday & Co.*, 615 F.2d 241, 245 (5th Cir. 1980).

Nasti argues that while Ciba's 2004 Annual Report does not specifically mention her, it implicates her by innuendo, to persons who are familiar with her situation, as the employee responsible for the abuse of expense claims. Accordingly, Nasti seems to claim that the report is libel per quod. As Nasti correctly asserts, a statement may be libel even when it is not obviously hurtful on its face and requires extrinsic facts or circumstances to explain its defamatory meaning. *Bell v. Orlando Daily Newspapers, Inc.*, 389 F.2d 579, 582 (5th Cir. 1967). Innuendo may be used to evidence a statement's meaning by connecting the allegedly defamatory statement with extrinsic facts and circumstances. *Moore v. Waldrop*, 166 S.W.3d 380, 386 (Tex. App.—Waco 2005, no pet.).

Here, however, Nasti has failed to produce evidence of innuendo or explain how the extrinsic facts and circumstances of this case demonstrate that the statement in Ciba's annual report defamed her. Aside from correctly stating the law relating to libel in her Response to Ciba's motion, Nasti makes no mention of how this law applies to the facts of this case. In her deposition, Nasti did explain that she had "assumed because Ciba had said that I was let go for expense abuse, that because it said that a person had been let go because of expense report abuse in the annual report, that they meant me." Nasti Dep. 158: 15-18. She also stated that she believed that persons reading the report would connect it to her because "allegedly [she] was terminated because of expense. [Her] expense reporting. And [she] had a very highly visible job and [she] was suddenly terminated." *Id.* 426: 4-6. This is not enough to raise a genuine issue of fact as to whether the statement printed in Ciba's annual report was defamatory toward Nasti. Nasti has failed to present evidence, other than her own assumptions, that the statement in the annual report referred to her or that it could reasonably be read to refer to her.

Additionally, Ciba has produced evidence showing that the statement in its annual report did not refer to Nasti and could not be reasonably interpreted as referring to her.  As Ciba notes, the 2004 report constitutes an annual report for the entire group of Ciba's global companies. Thomas Koch, General Counsel for Ciba's global affiliate that publishes the annual report, testified that the statement in the annual report regarding an employee who was terminated in connection with a "serious abuse of expense claims," is not a reference to Nasti, but rather to an employee of the Basel, Switzerland office.  Koch Aff. ¶ 3.  The employee referenced in the report had no connection with Ciba in the United States.  *Id.* ¶ 4.  Because Nasti has failed to present any evidence connecting the statement in the annual report to her, she has not made out a case of defamation, and summary judgment for Ciba on this claim is appropriate.

**D. FMLA Claim**

Nasti alleges that Ciba violated the FMLA by terminating her while she was on FMLA leave.  The FMLA prohibits employers from retaliating against employees who exercise their FMLA rights.  29 U.S.C. § 2615(a); *Hunt v. Rapides Healthcare Sys., LLC*, 277 F.3d 757, 763 (5th Cir. 2001).  To make a prima facie showing of retaliation under the FMLA, a plaintiff must show that (1) she was protected under the FMLA; (2) she suffered an adverse employment decision; and either (3)(a) she was treated less favorably than an employee who had not requested leave under the FMLA; or (3)(b) the adverse decision was made because she took FMLA leave.  *Hunt*, 277 F.3d at 768.  Nasti's FMLA claim fails because she cannot show that she was protected under the FMLA, or that she was terminated because she requested FMLA leave or treated less favorably than an employee who had not requested FMLA leave.

The FMLA provides that an "eligible employee" does not include "any employee of an employer who is employed at a worksite at which such employer employs less than 50 employees if the total number of employees employed by that employer within 75 miles of that worksite is

less than 50." 29 U.S.C. § 2611(2)(B)(ii).  When Nasti took a leave of absence and at the time of her termination in January 2004, she was assigned to Ciba's Greenspoint office in Houston, Texas and worked primarily out of her home in The Woodlands, Texas.  Becherer Aff. ¶ 34.  Ciba has presented evidence that it has less than ten employees assigned to its Greenspoint office, and that it does not employ fifty or more employees within seventy-five miles of the Greenspoint office or of Nasti's home address in The Woodlands.  *Id.*  Nasti presents no evidence to rebut this. Accordingly, Nasti is not eligible to pursue a claim under the FMLA.

Additionally, Nasti has not presented evidence showing that she was terminated because she requested FMLA leave.  As Ciba correctly points out, Nasti bears the burden of establishing that she was terminated because she took FMLA leave, or that she was treated less favorably than an employee who had not requested leave under the FMLA.  *See Hunt*, 277 F.3d at 768.  Nasti has made no attempt to do so, in either her Second Amended Complaint or in her Response to Ciba's Motion for Summary Judgment.  Because Nasti has failed to establish a prima facie case of retaliation under the FMLA, Ciba is entitled to summary judgment on Nasti's FMLA claim.

## III. CONCLUSION

For the reasons set forth above, Ciba's Motion for Summary Judgment is **GRANTED**, and the case is **DISMISSED WITH PREJUDICE**.

**IT IS SO ORDERED**.

**SIGNED** this 1st day of February, 2006.

KEITH P. ELLISON
UNITED STATES DISTRICT JUDGE

TO INSURE PROPER NOTICE, EACH PARTY WHO RECEIVES THIS ORDER SHALL
FORWARD A COPY OF IT TO EVERY OTHER PARTY AND AFFECTED NON-PARTY
EVEN THOUGH THEY MAY HAVE BEEN SENT ONE BY THE COURT