United States Court of Appeals
Fifth Circuit
**F I L E D**
July 12, 2007
Charles R. Fulbruge III
Clerk

United States Bankruptcy Court
Southern District of Texas
FILED
AUG - 7 2007
Michael N. Milby, Clerk

IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

No. 06-20370

JOANNE MACKAY NASTI,

Plaintiff-Appellant,

versus

CIBA SPECIALTY CHEMICALS,

Defendant-Appellee.

Appeal from the United States District Court
for the Southern District of Texas

Before JONES, Chief Judge, and Judges BENAVIDES and STEWART, Circuit Judges.

CARL E. STEWART, Circuit Judge:

This appeal arises from JoAnne Nasti's claims against CIBA Specialty Chemicals Corporation for sex discrimination and defamation. Nasti appeals the district court's summary judgment ruling for CIBA. We affirm.

I. FACTUAL AND PROCEDURAL BACKGROUND

Nasti began her employment with Ciba in 1997. In 2002, Nasti accepted the position of Global Account Executive and became the manager of Ciba's Dow Global account, a position Ciba classified as "Grade 11." At that time, Nasti was designated at "Grade 10." Ciba management

informed Nasti that her personnel ranking would remain at Grade 10 until she demonstrated her ability to fulfill the requirements of the position and manage a Grade 11 account.

In 2003, Nasti communicated with Stephan Bocken, President of Ciba's Paper Division in Switzerland, who expressed an interest in discussing a possible position for Nasti in his division. In October 2003, Nasti met with David Almond, a sales director who reported to Bocken, to discuss a potential sales manager position. Nasti indicates that she was later informed by Bocken and Almond that they had been told that she was on a performance improvement plan and was "untouchable" in the company.

Ciba concedes that Nasti met with Almond to discuss a possible position in Bocken's division; however, Ciba asserts that the position for which Nasti interviewed had not yet been approved for recruitment and ultimately never developed into an opening. Rather, Almond's segment decided to assign the duties that would have been performed by the new manager to existing account managers and then used the opening to replace a different key role in the division that Nasti was not qualified to hold.

Also in 2003, Nasti agreed to assist with Bostik Findley, one of Ciba's smaller clients, after a Ciba competitor offered the Bostik Findley facility in Milwaukee a low price on a product. In August 2003, Nasti visited Bostik Findley's Milwaukee facility with Chris Fagouri, the Ciba representative who was the primary contact for the Bostik Findley account. Nasti combined this trip to Bostik Findley with a personal trip to see her daughter in South Bend, Indiana, which Nasti had already scheduled. To accommodate the need for the meeting, Nasti adjusted her return flight so that she would be able to meet with Bostik Findley representatives on Monday, August 25, 2003. Nasti used her personal frequent flyer miles for the trip, and Ciba incurred no expense for Nasti's airfare,

despite the fact that Nasti was entitled to charge the tickets to Ciba under company policy. At the August 25 meeting, Nasti and Fagouri met with Bostik Findley representatives Barb Brown, Gary Delzell, and Gary Wilkes, who agreed to consider a Ciba product that could match the pricing offered by Ciba's competitor.

Nasti then scheduled a follow-up visit in Milwaukee with Barb Brown for September 22, 2003. Due to Chicago's close proximity to Milwaukee, Nasti booked a non-refundable ticket for the trip through Chicago. A week later, Nasti learned that Gary Delzel had replaced Brown in her purchasing role at Bostik Findley. On September 19, Nasti departed for Chicago and called Gary Delzel from the airport to confirm the Monday meeting. Nasti discovered that Brown had not informed Delzel of the meeting; however, because she had booked a non-refundable ticket, she decided to make the trip and planned to meet with Bostik Findley's technical personnel who would be evaluating Ciba's product. Upon arriving in Chicago, Nasti drove to South Bend, Indiana, to see her daughter and brother. Nasti testified that it was "a routine practice and allowable at Ciba to combine business and personal matters while traveling, especially over a weekend."

On Saturday, September 20, Nasti learned that she would be able to schedule an urgent meeting for her major ExxonMobil account on September 25, 2003. Nasti therefore decided to return to her office in Houston on Monday, September 22 without visiting the Bostik Findley facility, so that she could begin planning for the ExxonMobil meeting. On September 22, Nasti flew to Houston and went directly to her office, where she participated in conference calls with Becherer and others regarding the ExxonMobil account.

Nasti submitted expense reports seeking reimbursement for two trips to Bostik Findley, one in August and one in September. For the September trip, Nasti sought reimbursement for her rental

car, dinner, tolls, and airport parking, for a total of $270.00. In November 2003, Becherer asked Nasti to explain the expenses and to submit call reports, which are documents detailing client meetings, as Ciba's protocol required. Nasti forwarded to Becherer a call report for the August trip, which she had previously submitted to him. Nasti also submitted to Becherer a call report detailing the second trip in September. This call report indicated that Nasti had "scheduled this meeting with Gary Wilkes to discuss and close." The call report then stated that "Gary began the meeting . . . . He asked why we hadn't yet provided a sample and I showed him the shipping documentation. He excused himself from the table and returned with the sample in his hand. He had found it on Barb's desk."

Nasti testified in her affidavit that Becherer was familiar with her need to abandon the September Bostik Findley trip in order to return to Houston to plan for the ExxonMobil meeting, as Becherer had participated in the conference calls with her on September 22. Nasti assumed that Becherer needed her to satisfy internal auditing standards for the rental car expense and wrote the call report with this in mind. Nasti alleges that she had no intention of deceiving anyone and wrote the call report to memorialize what took place during the telephone calls that had substituted for her intended visit to the Bostik Findley facility. Nasti also maintains that the charges for which she had sought reimbursement were legitimate business expenses.

Becherer testified by affidavit that he found Nasti's call report for the September trip troubling. Nasti had submitted the report only after he asked her to document expenses that she had already turned in for reimbursement. Becherer had also instructed Nasti to make only one visit to the Bostik Findley facility in Milwaukee and thereafter to handle the account from Houston. Finally,

Becherer felt that the report lacked "meat" and "failed to show why another visit to Bostik Findley's Milwaukee facility was necessary." Becherer wondered whether the trip had actually occurred.

By this time in late 2003, Ciba's management had begun discussing whether or not Nasti had a future at Ciba. Nasti's managers felt that while Nasti had strong business skills, she had also demonstrated sufficient deficiencies in key areas such as team-building, counseling employees, listening to peers, enlisting support, and providing feedback. Around the Thanksgiving holiday, Nasti's various managers, with input from Ciba's Human Resources group, decided to terminate Nasti for these performance reasons. The group chose not to discharge Nasti prior to the holidays, but rather to wait until January 2004.

Between the time when Ciba management decided to terminate Nasti in late November 2003 and efforts to arrange a meeting with Nasti in January 2004, Becherer followed up on the call report Nasti had previously submitted for the September trip to the Bostik Findley facility. After Becherer contacted Bostik Findley and learned that the September meeting had not taken place, Becherer discussed Nasti's call report with his supervisor, Bill Baker, and Human Resources manager Gregory Policastro. Becherer, Baker, and Policastro concluded that Nasti had submitted a false call report. Because they believed that Nasti's call report overshadowed the existing issues concerning her performance, they decided to terminate Nasti's employment for the allegedly false call report and the submission of expenses in connection with the call report.

Because Nasti had taken a disability leave of absence in early January 2004, Policastro and Becherer informed Nasti of her termination in a telephone call, which took place on January 20, 2004, and in which her husband, Gary Nasti, participated. Policastro testified that when first asked about the second Bostik Findley trip in September 2003, Nasti maintained that she had attended this

second meeting at the customer's location. After Becherer told Nasti that he had contacted Bostik Findley and learned that the second meeting did not take place, Nasti explained that she had cancelled the trip in light of the ExxonMobil meeting and that her call report described the telephone calls that took place in lieu of the meeting.

Nasti subsequently filed a lawsuit in federal district court, contending that Ciba discriminated against her on the basis of her gender and terminated her in violation of the FMLA. In her Second Amended Complaint, Nasti added a claim against Ciba for defamation. After a hearing, the district court granted summary judgment for CIBA. Nasti appeals the district court's rulings on her gender discrimination and defamation claims.

## II. STANDARD OF REVIEW

The applicable standard of review is de novo. *See Urbano v. Continental Airlines, Inc.*, 138 F.3d 204, 205 (5th Cir. 1998). Summary judgment is proper if the evidence shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *Kee v. City of Rowlett*, 247 F.3d 206, 210 (5th Cir. 2001) (quotations omitted). The Court views all evidence in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. *Crawford v. Formosa Plastics Corp.*, 234 F.3d 899, 902 (5th Cir. 2000).

## III. DISCUSSION

A. Discriminatory Termination

Title VII prohibits an employer from discriminating "against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). A plaintiff may prove Title VII discrimination through direct evidence or circumstantial evidence. *Laxton v. Gap Inc.*, 333 F.3d 572,

578 (5th Cir. 2003); *Russell v. McKinney Hosp. Venture*, 235 F.3d 219, 222 (5th Cir. 2000). Where there is no direct evidence of discrimination, as Nasti concedes is the case here, a plaintiff may prove a case of sex discrimination with circumstantial evidence, using the burden shifting framework established by *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). *See Wallace v. Methodist Hosp. Sys.*, 271 F.3d 212, 219 (5th Cir. 2001).

Under the *McDonnell Douglas* framework, a plaintiff must first establish a prima facie case of sex discrimination. *Wallace*, 271 F.3d at 219. The employer then bears the burden of producing a legitimate, non-discriminatory reason for its actions. *Id*. The employer is not required to convince the Court that it was actually motivated by this reason; it need only raise a genuine issue of fact as to whether or not it discriminated against the plaintiff. *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254 (1981). Once the employer offers a legitimate, nondiscriminatory reason for the plaintiff's treatment, the presumptions of the *McDonnell Douglas* framework dissipate, and the plaintiff bears the ultimate burden of persuading the trier of fact that the defendant engaged in intentional discrimination. *Wallace*, 271 F.3d at 219; *Russell*, 235 F.3d at 222. To satisfy this burden, a plaintiff must produce substantial evidence that the employer's proffered reasons for its actions were a pretext for discrimination. *Wallace*, 271 F.3d at 220. A plaintiff can establish pretext "either through evidence of disparate treatment or by showing that the employer's proffered explanation is false or 'unworthy of credence.'" *Laxton*, 333 F.3d at 578 (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000)).

To establish a prima facie case, Nasti must demonstrate that (1) she belongs to a protected group, (2) she was qualified for her position, (3) she suffered an adverse employment action; and (4) she was replaced with a similarly qualified person who was not a member of her protected group,

or in the case of disparate treatment, that similarly situated employees were treated more favorably. *Okoye v. Univ. of Tex. Houston Health Sci. Ctr.*, 245 F.3d 507, 512-13 (5th Cir. 2001).

Viewing the evidence in the light most favorable to the nonmoving party, we hold that Nasti has asserted a prima facie case and the burden shifts to Ciba to articulate a legitimate, non-discriminatory reason for terminating Nasti.[1] Ciba has met its burden of producing a legitimate reason, which is that Nasti submitted a false call report. Accordingly, Nasti must raise a genuine issue of material fact as to whether this explanation is merely pretext, such that a reasonable factfinder could infer discrimination.

The pretext inquiry focuses on the authenticity of the employer's proffered reason. "In appropriate circumstances, the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose. Such an inference is consistent with the general principle of evidence law that the factfinder is entitled to consider a party's dishonesty about a material fact as 'affirmative evidence of guilt.' *Wright v. West*, 505 U.S. 277, 296 (1992). A "plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated." *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 148 (2000).

Nasti argues that Ciba has offered two inconsistent explanations for her termination. Nasti argues that Ciba states it terminated her for a false call report while at the same time stating that it terminated her for performance related reasons. A court may infer pretext where a defendant has provided inconsistent or conflicting explanations for its conduct. *See Read v. BT Alex Brown Inc.*,

---

[1] Ciba conceded, for the sake of argument, in its summary judgment motion before the district court that Nasti asserted a prima facie case. *See Nasti v. Ciba Specialty Chemicals*, No. H-04-04590 (S. D. Tex. February 1, 2006).

8

72 Fed. Appx. 112, 120, 2003 WL 21754966, at *7 (5th Cir. 2003). The district court found that Ciba's two explanations were not, in fact, inconsistent but rather two separate, independent decisions to terminate Nasti. The district court relied on the testimony of Becherer, Baker, and Policastro that the decision to terminate Nasti for the false call report and the submission of expenses in connection with that call report overrode and superseded all other problems with Nasti's performance and the previous decision to terminate her. Nasti responds by arguing that although there could have been two independent rationales used by Ciba to terminate her, a reasonable factfinder could infer from the inconsistencies that the proffered reason for Nasti's termination was pretextual. The district court's analysis is compelling. Ciba has not provided inconsistent reasons. Ciba has consistently stated that while it planned to terminate Nasti for performance related reasons, its ultimate decision to terminate her was based on the alleged falsification of the expense and call reports. Even if we are to assume that the two justifications are inconsistent, they are not sufficient as to raise a material issue of fact as to whether Ciba's ultimate decision to terminate Nasti was a pretext for discrimination

Therefore, Nasti's pretext claim rests on whether Ciba's justification, that Nasti falsified a call report, was false. Nasti argues that Ciba, specifically her supervisor Becherer, knew she could not attend the second meeting in Milwaukee. She points to the fact that she was on a conference call with Becherer on September 22 as evidence. Based on her version of facts, Nasti's argument is plausible. If Becherer participated in an emergency conference call with Nasti the Monday following her weekend trip, he would have no reason to inquire later as to whether she was at a sales meeting in Milwaukee that very same day. And because of the emergency nature of the September 22 meeting, he would also understand why Nasti had to cut short her trip and plans to visit Milwaukee.

9

He would also understand why Nasti would nonetheless bill Ciba for the expenses incurred the weekend before the cancelled trip. If the record bore this out, this would raise a material fact issue as to whether Ciba's legitimate nondiscriminatory reason was actually false.

The record, however, does not reflect Nasti's version of events. Becherer testified in an affidavit that he was unaware that Nasti cancelled the second meeting in Milwaukee when he received her call report and her email justifying the expense. Becherer, Baker, and Policastro all testified that they believed Nasti attempted to mislead the company in the call report. Policastro testified in an affidavit that Nasti only acknowledged that she had not visited Milwaukee for the second trip after he confronted her in a phone conversation. Policastro's affidavit states that Nasti maintained that she made the visit to Milwaukee in emails, the call report itself, and in phone conversations between November 10, 2003, and January 20, 2004, when Policastro told her that he had spoken with the client.

Viewing all the evidence in Nasti's favor, there is no evidence suggesting anyone else knew of Nasti's second trip, including Policastro, Ciba's HR Manager, who informed Nasti of the decision to terminate. Even if we assume that Becherer influenced Policastro with discriminatory animus, *see Russell v. McKinney Hosp. Venture*, 235 F.3d 219, 226-7 (5th Cir. 2000) (stating that if decisionmaker rubber stamps the wishes of others, that decisionmaker could inherit discriminatory taint), Policastro testified that after questioning her regarding the report, Nasti maintained to him personally that the second meeting had taken place.

Nasti's argument that she justified the report because she felt that this was what Becherer wanted is plausible but this does not prove or raise a material issue as to whether Ciba's reasonably believed that her call report was false or whether it terminated her for that reason. After viewing all

the evidence in Nasti's favor, the record demonstrates that Ciba thought Nasti turned in a false report and that Ciba terminated Nasti for that reason.

Alternatively, Nasti argues for the first time on appeal that her employer had mixed-motives for terminating her. This court has noted that "no bright-line rule exists for determining whether a matter was raised below." *See N.Y. Life Ins. Co. v. Brown*, 84 F.3d 137, 142 n.4 (5th Cir. 1996). Nonetheless, if a "litigant desires to preserve an argument for appeal, the litigant must press and not merely intimate the argument during the proceedings before the district court. If an argument is not raised to such a degree that the district court has an opportunity to rule on it, we will not address it on appeal." *FDIC v. Mijalis*, 15 F.3d 1314, 1327 (5th Cir. 1994).

Because she failed to present her mixed-motives claim to the district court in the first instance, Nasti has waived it. Nasti's claims that she never falsified a call report conflicts with a mixed-motive theory of recovery, whereby plaintiffs allege that the legitimate nondiscriminatory reason is not the *primary* reason for termination. Nasti never conceded before the district court, even for argument's sake, that Ciba had a legitimate nondiscriminatory reason to terminate her. Thus, it cannot be said that the district court had the opportunity to rule on her mixed-motive claim.

B. Defamation Claim

Nasti alleges that the district court erred by not finding this statement published in Ciba's 2004 Annual Report defamatory: "In 2004 there were two incidents that merited disciplinary action: a conflict of interest in materials purchasing and a serious abuse of expense claims. Those responsible are no longer employed by the company." Nasti argues that while Ciba's 2004 Annual Report does not specifically mention her, it implicates her by innuendo to persons who are familiar with her situation as the employee responsible for the abuse of expense claims.

11

For a plaintiff who is not a public figure to establish a defamation claim under Texas law, the plaintiff must prove that the defendant: (1) published a statement; (2) that was defamatory concerning the plaintiff; (3) while acting negligently with regard to the truth of the statement. *WFAA-TV, Inc. v. McLemore*, 978 S.W.2d 568, 571 (Tex. 1998). A statement may be libel even when it is not obviously hurtful on its face and requires extrinsic facts or circumstances to explain its defamatory meaning. *Bell v. Orlando Daily Newspapers, Inc.*, 389 F.2d 579, 582 (5th Cir. 1967). Innuendo may be used to evidence a statement's meaning by connecting the allegedly defamatory statement with extrinsic facts and circumstances. *Moore v. Waldrop*, 166 S.W.3d 380, 386 (Tex. App. 2005).

The district court held that Nasti had failed to raise a material issue of fact that the statement referred to her. The court concluded that she had failed to present any evidence "other than her own assumptions . . . that the statement in the annual report referred to her or that it could reasonably be read to refer to her." The district court relied on testimony from Thomas Koch, General Counsel for Ciba's global affiliate that publishes the annual report, that the reference was not related to Nasti but to an employee at the company's Basel, Switzerland office.

Nasti has not pointed to any evidence in the record that this court could construe in her favor. Other than her own beliefs, there is nothing else in the record that supports the view that the statement in the Annual Report concerned her. *See Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc) ("We resolve factual controversies in favor of the nonmoving party, but only when there is an actual controversy, that is, when both parties have submitted evidence of contradictory facts. We do not, however, in the absence of any proof, assume that the nonmoving party could or would prove the necessary facts."). For the foregoing reasons, we affirm.